FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

2018 DEC -3  AM 11: 38

MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA,
STATE OF ALASKA,
STATE OF CALIFORNIA,
STATE OF COLORADO,
STATE OF CONNECTICUT,
STATE OF DELAWARE,
STATE OF FLORIDA,
STATE OF GEORGIA,
STATE OF HAWAII,
STATE OF ILLINOIS,
STATE OF INDIANA,
STATE OF LOUISIANA,
STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN,
STATE OF MINNESOTA,
STATE OF MONTANA,
STATE OF NEVADA,
STATE OF NEW HAMPSHIRE,
STATE OF NEW JERSEY,
STATE OF NEW MEXICO,
STATE OF NEW YORK,
STATE OF NORTH CAROLINA,
STATE OF OKLAHOMA,
STATE OF RHODE ISLAND,
STATE OF TENNESSEE,
STATE OF TEXAS,
COMMONWEALTH OF VIRGINIA,
STATE OF WISCONSIN, and
DISTRICT OF COLUMBIA, *ex rel*. RICHARD
MANNINO and DAWN BUTTERFIELD
                    Plaintiffs,

            v.

OPTUM, INC., OPTUMRX, INC.,
UNITEDHEALTH GROUP, INC., CIGNA
CORPORATION, and, CIGNA HEALTH AND
LIFE INSURANCE COMPANY,

                    Defendants.

NO. 8:18-cv-2929-T-02TGW

**COMPLAINT PURSUANT TO**
**FEDERAL FALSE CLAIMS ACT,**
**31 U.S.C. § 3729 *et seq.*,**
**AND PENDENT STATE**
**FALSE CLAIMS ACTS**

**FILED *IN CAMERA***
**AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730**

**NOT FOR PUBLIC DISCLOSURE**
**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

**JURY TRIAL DEMANDED**

1

$400
TPAU54331

S-1

Plaintiffs Richard Mannino and Dawn Butterfield, on behalf of the United States, the

State of Alaska, the State of California, the State of Colorado, the State of Connecticut, the State

of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois,

the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of

Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of

Nevada, the State of New Jersey, the State of New Mexico, the State of New Hampshire, the

State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode

Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of

Wisconsin and the District of Columbia (collectively "the States" or "the Plaintiff States"), bring

this action for violations of the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("False

Claims Act" or "FCA"), as well as for violations of the following state false claims acts: The

Alaska Medical Assistance False Claims Reporting Act, Ak Stat § 09.58.010 *et seq*; The

California False Claims Act, Cal. Gov't Code §§12650 *et seq.*; The Colorado Medicaid False

Claims Act, 25.5-4-304-25.5-4-310; The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-

301b; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The

Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida

False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga.

Code Ann. §§49-4-168 *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*;

The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et*

*seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The

Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland

False Health Claims Act of 2010, Md. Code Ann. § 2-602 *et seq.*; The Massachusetts False

Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act,

MCLS §§400.601 *et seq.*; The Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; The

Montana False Claims Act, Mont. Code Anno. §§17-8-401 *et seq.*; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Hampshire False Claims Act, RSA tit. XII, Ch. 167: 61-b; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §27-2F-4 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.* and the Wisconsin False Claims for Medical Assistance Act[1], Wis. Stats. §§20.931 (hereinafter referred to collectively as the "State False Claims Acts" or "State FCA's"),  to recover all damages, civil penalties and all other recoveries provided for under the Federal False Claims Act and the State False Claims Acts.

## SUMMARY OF THE CASE

1.      This case involves Defendants' scheme to collect undisclosed cash kickbacks on pharmaceutical transactions in which the government is the end payor.

2.      Defendants UnitedHealth Group, Inc. ("UHG") and Cigna Corporation ("Cigna") provide private primary health insurance, including prescription pharmaceutical insurance coverage, as well as third party administrators for self insured plans.  Optum (a wholly owned business of UHG, as defined further below) provides pharmacy benefit manager ("PBM") services for UHG, Cigna and others, including for the transactions at issue here.  Cigna, UHG, and Optum are collectively referred to herein as "Defendants."

---

[1] The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931, *et seq.* was repealed effective July 15, 2015.  Relators seek to recover for false claims submitted prior to the repeal.

3

3.      Defendants' scheme works as follows. An individual fills a prescription at a pharmacy. This individual has pharmaceutical benefits coverage through a government health program such that the government is an end payor (i.e., either a primary or secondary insurer). Defendants – who provide prescription coverage and/or PBM services – process and control the pharmaceutical transaction.  In the event the prescription is for an inexpensive generic drug, Defendants use their leverage to require a pharmacy, as a condition of "network" participation, to pay Defendants an amount that often exceeds the pharmacy's cost of the pharmaceutical being dispensed.  Thus, unbeknownst to the individual customer or the government health program, the cost of the prescription is dramatically inflated and includes a "kickback" – an undisclosed amount of money that Defendants forcibly claw back from the pharmacy (the kickback is also referred to as a "clawback").[2]

4.      Regardless of whether the government serves as a primary or secondary payor, Defendants instantaneously submit an electronic claim to the relevant end payor government health program for: (1) a co-payment; (2) a co-insurance amount; or, (3) the purported cost of the pharmaceutical (and dispensing fee). As the end payor, the government health program thus pays the requested amount unaware that it includes a fixed transaction-specific cash kickback.  An example of such a kickback is reflected in the below screenshot:

---

[2]  The part of Defendants' scheme that involves payments made by pharmacy customers (i.e., where Defendants' own insureds are the end payors) is the subject of several class action lawsuits for, among others, violations of ERISA and RICO.  *Negron v. Cigna Health and Life Insurance*, No. 16-cv-1702 (D. Conn.); *In re Humana, Inc. PBM Litig.*, No. 16-cv-706 (W.D. Ky.); and, *Mohr-Lercara v. Oxford Health Insurance, Inc., et al.*, No. 18-cv-1427 (SDNY). Several states have explicitly outlawed the practice and at least one large PBM (Express Scripts) publicly announced that does not impose "clawbacks." *See* http://lab.express-scripts.com/lab/insights/drug-options/keeping-copays-affordable. The kickback/clawback allegation outlined in this complaint is not yet public.



DB-000001

5.      As reflected in the above example, Cigna – the primary insurer – did not do or pay anything in connection with this covered benefit, but took from the pharmacy a $6.56 cash payment. Simultaneously, Medicaid – the secondary insurer – paid the pharmacy $2.59. Thus understood, the overall monetary effect of this transaction can be summarized as follows:

- Cigna – the primary insurer – did nothing and received a kickback of $6.56.

- Medicaid – the secondary insurer – was fraudulently charged $2.59.

- The pharmacy (having bought the drug for $1.35 and forcibly paying a $6.56 kickback) lost $5.32.

The submission of this claim to Medicaid was false, tainted by a kickback and caused the government to overpay for the drug.

6.      Defendants accomplish this fraud through an opaque billing system that they designed, control and keep secret through gag-clauses with participating pharmacies. In

5

exchange for the kickback, the pharmacy is permitted to remain in Defendants' pharmacy network. Pharmacies that refuse to engage in this scheme are threatened with termination.

7.  This scheme violates the Anti-Kickback statute, the False Claims Act, and the State False Claims Acts. Plaintiff brings this action to recoup government funds unlawfully taken by Defendants.

## THE PARTIES

### A.  Plaintiff/Relator Richard Mannino

8.  Plaintiff Richard Mannino ("Mannino") is a pharmacist. He resides in the State of Louisiana. Mannino is a registered pharmacist with a BS degree from the University of Louisiana at Monroe (formerly Northeast Louisiana University) and is the owner of Mannino's Family Practice Pharmacy, in Hammond, LA. It is through his role and position as a pharmacist that Mannino learned of the kickback/clawback scheme.

9.  Mannino served as the anonymous original source for the news report that appeared on May 4, 2016, on Fox 8 in New Orleans, entitled "Copay or you-pay? Prescription drug clawbacks draw fire" (the, "Fox 8 Report"). This was the first public article that disclosed detailed information about the unlawful kickback/clawback scheme alleged herein. However, the Fox 8 Report did not discuss what affect, if any, Defendants' scheme had on government health programs.

### B.  Plaintiff/Relator Dawn Butterfield

10.  Plaintiff Dawn Butterfield ("Butterfield") is a pharmacist. She resides in the State of Florida. Butterfield is a registered pharmacist with a BS degree from Auburn University and is the owner and operator of West Cocoa Pharmacy & Compounding, in Cocoa, FL. Prior to that, she served as a pharmacist at Walmart, CVS and elsewhere. She also served a hospital representative and infectious disease specialist. It is through her role and position as a pharmacist

and the owner of a pharmacy that Butterfield learned of the kickback/clawback scheme at issue here.

11.     Butterfield attempted to shed light on Defendants' practices and bring these unlawful practices to the attention of her local government officials, and was explicitly told by Defendants and/or their agents that she should refrain from publicly discussing these matters or expect to be expelled from their pharmacy/PBM network.  Specifically, representatives of Catamaran (now owned by UHC/Optum) stated in 2015: "If you continue to discuss pricing with the client or CatamaranRx (Cigna) CatamaranRX will terminate their agreement with your pharmacy for their networks." In response to her efforts to bring Defendants' wrongdoing to her township's attention, Cigna executives called her the "rogue pharmacist."

## C.     Defendants UHG & Optum

12.     Defendant UHG is a Delaware corporation, headquartered in Minnetonka, Minnesota.  UHG is a diversified health care benefits provider to an array of customers, markets, employers, retirees and military personnel.  UHG operates in two distinct business platforms: health benefits under UnitedHealthcare ("UHC"); and, health services under Optum.

13.     Defendant Optum, Inc., is a Delaware corporation with headquarters in Eden Prairie, Minnesota. Optum is a wholly owned subsidiary of UHG.

14.     Defendant OptumRx, Inc. is a California corporation, headquartered in Irvine, California. OptumRx is a wholly owned subsidiary of UHG.

15.     Optum is a health services business serving payers, care providers, employers, governments, life sciences companies and consumers. Optum is organized in three reportable segments: OptumHealth, OptumInsight and OptumRx.

16.     In fiscal year 2017, UHG processed nearly three-quarters of a trillion dollars in gross billed charges, managed nearly $250 billion in aggregate health care spending and reported

7

consolidated revenues of over $201 billion. *See* UHG 2017 Form 10-K at 1, 32. UHG is currently ranked 12th on the Fortune 500.

17.     Optum (and its OptumRx segment) represents a substantial source of UHG's activities, providing annual pharmaceutical services to 91 million individuals, fulfilling 1.3 billion scripts, totaling $85 billion in pharmaceutical spending. *See* UHG 2017 Form 10-K at 7-9. OptumRx "provides a full spectrum of pharmacy care services to more than 65 million people in the United States through its network of more than 67,000 retail pharmacies, multiple home delivery and specialty pharmacies and through the provision of home infusion services." *See* UHG 2017 Form 10-K at 9.

18.     In the years 2015, 2016 and 2017, Optum accounted for between 43% to 45% of UHG's total revenues, and between 38% to 44% of UHG's total earnings.  These services are primarily driven by OptumRx. In the years 2015, 2016 and 2017, OptumRx accounted for roughly 70% of Optum's total revenues and between 41% and 47% of Optum's total earnings. Of UHG's total 2017 activities, OptumRx represented 31.7% of total UHG revenues and 20.5% of total UHG earnings.

19.     In July 2015, UHG acquired Catamaran which generated in fiscal year end 2015 roughly $12.4 billion in revenues, representing 8% of total consolidated revenue. Like OptumRx, Catamaran offered pharmacy benefits management services to millions of people, health plans, employers and IT solutions to the pharmacy benefits management industry. Catamaran previously served as the PBM for Cigna and other health insurance companies (a function that is now being performed by OptumRx).

20.     Accordingly, Optum (represented by Catamaran and the sub-segment OptumRx) is the PBM for not only the customers of UHC, but other medical and pharmaceutical insurance

providers as well, including Cigna (defined below), Blue Cross Blue Shield and other self-inured plans.

**D.    Defendant Cigna**

21.    Defendant Cigna, through its wholly-owned subsidiaries, including Defendant Cigna Health and Life Insurance Company ("CHL"), is a fully integrated health insurance company. Cigna is a global health services organization, incorporated in Delaware, with its principal place of business in Bloomfield, Connecticut. In 2017, Cigna reported revenue in excess of $41.6 billion, and the company is currently ranked 79th on the Fortune 500.

22.    Cigna operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S; and, (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

23.    Defendant CHL, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna with its principal place of business in Bloomfield, Connecticut. CHL underwrites life and health insurance policies. The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance.

24.    Cigna and its subsidiaries frequently use Optum as their PBM.

**E.    The Government Plaintiffs**

25.    The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Center for

Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid Programs.

26.     The States of Alaska, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New Hampshire, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin, and the District of Columbia are plaintiffs for whom recovery is sought.

27.     The United States and the States are collectively referred to as the "Government Plaintiffs."

28.     Relators have standing to bring this action pursuant to 31 U.S.C. §3730(b)(1) and analogous provisions in the State False Claims Acts. Relators bring this action on behalf of the United States for violations of the Federal False Claims Act and on behalf of each Plaintiff State named herein for violations of its respective State False Claims Acts.

29.     Relators' complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein. *See, e.g.,* 31 U.S.C. §3730(4)(A) and analogous state statutory provisions.

30.     Prior to filing this lawsuit, Relators voluntarily disclosed to the Government the information on which allegations or transactions in their claim are based. Further, Relators have knowledge that is direct, independent of and materially adds to any potential publicly disclosed allegations or transactions. Thus, Relators are original sources as that term is used in the False Claims Act and analogous state statutory provisions. *See, e.g.,* 31 U.S.C. §3730(4)(B).

## JURISDICTION AND VENUE

31.     Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 et *seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

32.    Venue in the Middle District of Florida is appropriate under 31 U.S.C. § 3732(a) and sufficient contacts exist for jurisdiction in that the Defendants transact or transacted business in this District.

## GOVERNMENT HEALTH PROGRAMS

33.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, established the Medicare program. The United States, through HHS, and its sub-agency, CMS, administers the Medicare Program.   Medicare pays for prescription drugs.

34.    Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act. Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C.S. § 1396 *et seq.* Among other things, the Medicaid programs of all states reimburse for prescription drugs. Many states award contracts to private companies to evaluate and to process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private contractors submit claims to the state Medicaid programs, which in turn obtain federal funds from the United States.

35.    The Civilian Health and Medical Program of the United States ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. TRICARE pays for, among other things, medical devices and surgeries for its beneficiaries.

36.    CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability, or who died from a VA-rated-service-connected disability.

37.     The Federal Employee Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. It pays for, among others, medical devices and surgeries for its beneficiaries. Under the FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government. As a result, fraud on an patient covered by the FEHBP constitutes fraud on the federal government and the loss of federal funds.

38.     Together, the programs described above, along with any other government-funded healthcare programs, are referred to as "government health programs."

## THE APPLICABLE LAW

### A.     The Federal False Claims Act

39.     The Federal False Claims Act provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

> \* \* \*
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

40.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461and 64 Fed. Reg.

47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**B.     The Federal Anti-Kickback Statute and Analogous State Statutes**

41.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

42.     Many of the states named as plaintiffs above have state-specific anti-kickback statutes that have the same goals as the AKS and which function similarly to the AKS.  Relators hereby allege violations of those statutes as a basis for false claims act liability under the respective State FCA's.  For ease of reference, however, only the federal AKS is described in more details below.

43.     The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S .C. § 1320a-7b(b). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C.§1320a-7(b)(7) and 42 U.S.C. §1320a-7a(a)(7).

**C.   Violations of the Anti-Kickback Statute Form the Basis of FCA Liability**

44.     Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d. Cir. 1985). Because kickback schemes negatively affect the integrity of federal health care programs, the United States has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.,* (3d Cir. Oct. 2010)(No. 10-2747) (Brief for the United States as Amicus Curie Supporting Appellant)("Amicus Brief").

45.     To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under the Medicare program. *See United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.,* 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies,* 423 F.3d 1256, 1259-1260

(11th Cir. 2005); and *United States v. Rogan,* 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd,* 517 F.3d 449 (7th Cir. 2008).

46.     These and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act regardless of what form the claim or statement takes.  Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to compliance with the AKS each time a claim is submitted.[3]

47.     Moreover, the AKS was amended in 2010 to expressly state what these courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  42 U.S.C. § 1320(a)-7b(g).

48.     Violations of state-specific anti-kickback statutes similarly result in liability under the respective State FCA's.

## BACKGROUND INFORMATION ON THE PHARMACEUTICAL INDUSTRY

### A. Industry Participants and Their Respective Roles

49.     If a health insurance policy covers outpatient prescription drugs, the cost of the drug is often shared between the insured and the insurer. Such cost sharing can take the form of deductible payments, co-insurance payments, and co-payments.

---

[3] *See, e.g., United States v. Rogan,* 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 245 (3d Cir. 2004); *Mason v. Medline Industries, Inc.,* 2010 WL 653542, at *5-9 (N.D. Ill. Feb. 18, 2010); *United States v. ex rel. Jamison v. McKesson Corp.,* 2009 WL 3176168 (N.D. Miss. September 29, 2009); *In re Pharmaceutical Indus. Average Wholesale Price Litig.,* 491 F. Supp. 2d 12, 17-18 (D. Mass. 2007); *United States ex rel. Bidani v. Lewis,* 264 F. Supp. 2d 612, 615-16; *United States ex rel. Franklin v. Parke-Davis,* 2003 WL 20048255 (D. Mass. August 22, 2003); *United States ex rel. Pogue v. Diabetes Treatment Centers of America,* 238 F. Supp. 2d 258, 264 (D.D.C. 2002); and *United States ex rel. Bartlett v. Tyrone Hospital, Inc.,* 234 F.R.D. 113, 121 (W.D. Pa. 2001).

50.     In general, deductibles are the dollar amounts the insured pays during the benefit period (usually a year) before the insurer starts to make payments for pharmaceutical costs. Co-insurance requires an insured person to pay a stated percentage of pharmaceutical costs, often after exhausting the deductible limit. Co-payments are fixed dollar payments made by an insured toward pharmaceutical costs.

51.     The provision of prescription drugs to patients involves business arrangements among numerous entities, including, but not limited to, pharmaceutical manufacturers, pharmaceutical wholesalers, pharmacy benefit managers ("PBMs"), pharmacies, health insurance companies, employers and insureds.

52.     On the distribution side of the prescription market, the pharmaceutical manufacturer typically sells its drugs to a wholesaler, which then sells the drugs to a retail pharmacy. The retail pharmacy then distributes the drugs to insureds from its inventory.

53.     The retail side of the prescription market is largely controlled by insurance companies and their contracted or owned PBMs. In most instances where a health insurance policy provides prescription benefits, the PBM is the agent of the insurance company or self-insured plans, i.e., the PBM is responsible for administering the prescription benefit for the insureds.  For example, unless specifically carved out, Optum generally serves as the PBM for individuals insured by UHG and Cigna.

54.     According to the Pharmaceutical Care Management Association, PBMs manage pharmacy benefits for 266 million Americans as of 2016.

55.     The three largest PBMs are: (i) Optum (owned by UHG); (ii) CVS Caremark[4]; and, (iii) Express Scripts.[5] These three companies manage the pharmacy benefits of approximately 75% of the market, and cover 180 million enrollees.

56.     Among the key functions of a PBM is to create and maintain a "network" of participating pharmacies that insureds may visit to access their prescription health benefits and facilitate payment for those pharmacies in the network.

57.     Insureds are unlikely to visit pharmacies that are out of their network, because such pharmacies cannot receive payment from the insured's insurance company.  So if a patient is insured by Cigna (whose PBM is Optum) and the patient fills a prescription at a pharmacy that is not in Optum's "network," the insured will have to pay the full price of the prescription, whereas if the pharmacy is within Optum's network and the prescription is covered under the Cigna policy, Cigna will pay for the insured's prescription.

58.     Thus understood, the financial viability of a pharmacy is largely dependent on the pharmacy being "in network" for as many PBM's as possible, and particularly the three large PBMs (Optum, Caremark, and ExpressScripts).

59.     When an insured presents a prescription at a pharmacy, key information such as the patient's name, pharmaceutical dispensed, and quantity dispensed is transmitted at the point of sale via interstate wire to a "switch" that then directs the information to the correct PBM.

60.     The PBM instantaneously processes the claim according to the benefits plan assigned to the insured. The PBM electronically transmits via interstate wire a message back to the pharmacy indicating whether the pharmaceutical and patient are covered and, if so, the

---

[4] In December 2017, Aetna announced that it was acquiring CVS Caremark.

[5] In March 2018, Cigna announced that it was acquiring Express Scripts.

amount the pharmacy must charge the insured as a co-payment, co-insurance, or to be paid toward a deductible.

61.     The PBM typically is responsible to pay the pharmacy any amounts owed to the pharmacy over the insured's co-payment, co-insurance, or deductible charges.  These payments are typically made bi-weekly, i.e., every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

**B.     Agreements Among Industry Participants**

62.     Contractual relationships exist between insureds (including their employers or the government) and health insurance companies; the health insurance companies and the PBMs; and the PBMs and the pharmacies.

63.     Typically, the government, employers or individuals themselves buy a health insurance policy from a health insurance company to provide, *inter alia*, coverage for prescription drugs.  Health insurance companies then hire PBMs to manage and administer the drug benefits offered pursuant to those policies.

64.     The following diagram represents (in simplified form) the contractual relationships among the various parties to a pharmaceutical transaction:



(a)     **Government/Employer/Individual–Insurer/Administrator Agreements (*i.e.*, Insurance Policies).**  Many health insurance policies provide, *inter alia*, prescription pharmaceutical benefits. These policies contain uniform provisions that set forth key plan terms

18

such as the mechanism for and amount of the deductible, co-payment, and/or co-insurance that an insured must pay to obtain prescription pharmaceutical benefits.

(b)     **Insurer–PBM Agreements.**  Health insurance companies contract with and/or own PBMs, which act as their agents to administer the prescription pharmaceutical benefits purchased through the health insurance policies that the insurers issue.

(c)     **PBM–Pharmacy Agreements.**  PBMs in turn, contract with pharmacies, which serve as providers in the insurers' pharmacy network. The pharmacies fill prescriptions that are covered under the insurers' policies. If a pharmacy wishes to be in a PBMs network, the pharmacy must sign an agreement with the PBM.  Under these agreements (hereinafter "Network Agreements"), the pharmacies are contractually required to: (1) fill any and all prescriptions presented by an insured; (2) charge the insured the precise amounts dictated by the PBM/Insurer for the prescriptions being filled; and, (3) accept from the PBM/Insurer as "reimbursement" any amounts determined by the PBM/Insurer.

65.     As a result of these relationships, pharmacies have little to no discretion with regard to the pricing and charges associates with a drug transaction.

66.     Moreover, those same agreements with PBMs typically contain gag-clauses which prohibit pharmacies from informing an insured that the amount the insured owes under his or her insurance plan is greater than the pharmacy's charges (or the amount the pharmacy has agreed to accept as payment in full) for the drug.

67.     Pharmacies that object to the terms of Network Agreements are not permitted to be included in the PBM's network.  Pharmacies that are not included in the networks operated by Optum, Caremark, and ExpressScripts suffer significant financial losses and often go out of business, or are forced to sell their business to someone who is willing to sign the Network Agreements.

68.     The relationship among the parties is shown graphically as follows:



69.     Pursuant to the health insurance policies between an insurance company and its customers, insurers are typically required to ensure that, when they contract with a PBM to act as their agent to manage prescription drug benefits under the health insurance policies, the PBM follows the policies' terms.

70.     Nonetheless, PBMs, acting as agents and/or in concert with health insurance companies, routinely charge insureds substantially higher prices for drug than are allowed under the health insurance policies.

C.     **Description of a Typical Prescription Drug Transaction**

71.     The process by which a prescription is filled and paid for is carried out electronically through a series of intermediaries. At the point of sale, the pharmacist manually enters basic information regarding the transaction into the pharmacy computer terminal, such as the customer's personal contact information, applicable insurance provider(s) and the prescription(s) sought.

20

72.     Importantly, while such pharmacy computer systems use certain automatically pre-populated fields with data drawn and updated automatically from third-party sources, any relevant pricing data at issue is provided by, or superseded with data from, the primary insurance provider and/or the PBM.

73.     Once this initial data is entered, the pharmacy submits the transaction into the computer system controlled by the PBM.  At this time, data is transmitted to a "switch" whose function is to connect the pharmacy's computer terminal with the other relevant parties—the PBM and/or primary insurer.

74.     The "switch" routes the data to the PBM and/or insurer, who determines coverage, adjudicates the claim and calculates the various payment and reimbursement amounts for each of the parties to the transaction.

75.     The same electronic sequence occurs when the primary or secondary payer is the government or a governmental program.

76.     A response to the submitted claim is transmitted back to the pharmacy within a few seconds of its submission.  The response tells the pharmacy how much any insurer (private or government) will pay – i.e., "reimburse" – the pharmacy.  However, in certain transactions where the PBM imposes a clawback, the pharmacy is directed by the PBM to pay the PBM – i.e., a "negative reimbursement" – and so the response tells the pharmacy how much it has to pay the PBM.

77.     This process is governed by a standard protocol developed by the National Council for Prescription Drug Programs ("NCPDP"). NCPDP standards provide for a common format and definition of specific data fields.  In other words, they ensure that all of the computers involved speak the same language. The government and private insurers therefore require the use of NCPDP standards. *See* 45 C.F.R. § 162.1102.

21

78.     NCPDP fields are all formatted such that certain fields cannot contain a negative number.  Were a negative number to appear in such a regulated field, the system would reject the transaction or change the negative value to zero and accept it.  Such is the case with the "Other Payer Amount Paid Field" identified as 431-DV.

79.     The 431-DV field normally contains a positive number that reflects the financial obligation (if any) of the primary insurer, i.e., the amount of money the primary insurer will pay the pharmacy to cover the insured's pharmaceutical purchase.

80.     As noted in detail below, in certain transaction, the pharmacy is directed by the PBM to pay a kickback to Defendants.  In those instances, the kickback/clawback imposed on the pharmacy by the PBM is reflected in this field as a negative number, meaning that rather than receiving money to fill the prescription, the pharmacy is directed to pay money to the PBM.

81.     Defendants have formatted the 431-DV field to convert any negative number into a zero, i.e., the kickback/clawback (i.e., a negative number in this field) is converted to a zero. This essentially masks the kickback/clawback for all participants in the transaction with the exception of the pharmacist (who must pay the kickback/clawback) and the PBM/Insurer (who receives the kickback/clawback).

82.     Under the Network Agreements that pharmacies are effectively forced to enter, pharmacies have no discretion with respect to how much they ultimately charge for a drug or how any payments for drugs are allocated between pharmacies and the other parties to the transaction.

## DEFENDANTS' KICKBACK SCHEME

83.     With the above background in mind, Defendants' kickback scheme operates as follows:

- If a pharmacy does not enter a Network Agreement with, at least, the three largest PBMs (Optum, Caremark, and ExpressScripts), customers are dissuaded from filling prescriptions at the pharmacy because the customers' insurance is not honored.

- Thus, PBMs effectively control the financial viability of pharmacies (and particularly non-chain pharmacies) because pharmacies are effectively forced to enter Network Agreements with PBMs in order to attract and/or maintain customers.

- Under its Network Agreements with pharmacies, Optum dictates the amounts paid to pharmacies (i.e., "reimbursed") for each transaction.  However, in transactions where the Network Agreement requires the pharmacy to pay a kickback, Optum dictates the amount of the kickback.

- The kickback is a fixed dollar amount unique to the individual pharmaceutical transaction.

- When the amount the pharmacy pays Optum exceeds the amount the pharmacy receives from the customer and/or the customer's insurer(ers), the pharmacy loses money.

- Through their market supremacy, Defendants force Pharmacies to enter network agreements under which the pharmacies lose money on a transactions in exchange for the opportunity to make up those losses and turn a profit on the majority of transactions, many of which are paid for by government health programs.

84.     An example transaction adjudicated under Optum's Network Agreement with

Relator Butterfield's pharmacy (West Cocoa Pharmacy & Compounding in Cocoa, Florida)

illustrates the fraud.

85.     On June 16, 2015, an insured customer sought to buy a prescription drug

(Omeprezole, used to treat heartburn)[6] from Relator's pharmacy. This insured had Cigna as a

primary insurer and Florida Medicaid as a secondary insurer.

---

[6] Defendants induce kickbacks most frequently on widely used, low-cost pharmaceuticals, and particularly generic pharmaceuticals, where the cost of the pharmaceutical is relatively low. This enables Optum to impose charges (either co-payments or an amount credited to the insured's deductible) that are higher than the cost of the pharmaceutical, thereby insuring for itself a "clawback." These commonly used pharmaceuticals include, but are not limited to: alprazolam, amlodipine, amoxicilin, sulfamethoxazole/trimethoprim, bupropion, buspirone, citalopram, ciprofloxacin, clonazepam, cyclobenzaprine, diazepam, fluticasone, gabapentin, hydrochlorothiazide, ibuprofen, lamotrigine, escitalopram, lisinopril, meloxican, naproxen, nitrofurantoin, oxybutynin, oxycodone/acetaminophen, fluoxetine, sprintec, omeprazole,

86.     Optum was Cigna's PBM.  The pharmacy had a network agreement with Optum that required the pharmacy to use Optum's PBM technology platform for prescriptions submitted on behalf of Cigna insureds. These agreements, entitled Provider Manuals, are available at: https://learn.optumrx.com/pharmacymanual.

87.     The PBM/Optum established and operated the computer system that adjudicated the claim and transaction at issue.  As noted above, Optum's Network Agreement with the pharmacy dictated the payments to be made by the parties to the transaction.

88.     The pharmacist – Relator Dawn Butterfield – entered the price of the drug and the patient/customer's insurance information into Optum's system.

89.     Once that information was entered, the following screen (DB-000001) was displayed.  The screen illustrates the flow of money among the pharmacy, Cigna, and Medicaid:



oseltarmivir, tizanidine, tramadol, trazodone, valsartan, venlafaxine, albuterol, ondansetron, levothyroxine, sertraline, doxycycline, atorvastatin, lisinopril, and zolpidem.

DB-000001

90.     As reflected above, the *primary* insurer – Cigna – did not pay anything for the Omeprezole delivered to its insured.

91.     Instead, the pharmacy – who previously had paid $1.35 to buy the Omeprezole so as to have it available for patients, and who incurred the costs necessary to fill the prescription – ***paid Cigna $6.56***.

92.     Simultaneously, Medicaid – the *secondary* payer – paid $2.59 to the pharmacy, which appears to be the sum of the cost of the drug as determined by Cigna ($1.19) plus a "dispending fee" as determined by Cigna ($1.40) to cover the pharmacy's administrative cost associated with the transaction).

93.     Thus understood, the pharmacy's total out of pocket cost for this transaction was $7.91 ($6.56 + $1.35 = $7.91), and the pharmacies total reimbursement was $2.59.

94.     The overall monetary effect of the transaction can be summarized as follows:

- Cigna, the primary insurer, was paid a kickback of $6.56

- The pharmacy who paid for the drug and who filled the prescription lost $5.32 ($7.91 – $2.59 = $5.32)

- Medicaid the secondary insurer, paid/lost $2.59

95.     Additional examples of Defendants' scheme are shown below in screenshots DB-000003, DB-000004 and DB-000005.

```
Drug OMEPRAZOLE DR 20 MG CAPSULE     Onhand 0         Last Qty 30      On 06/16/15
NDC 55111-0158-10 GENERIC PS 1000.00  Unit Dose? N
P  A                                  USE SAFETY CAP
   Quantity 30      Dispensed 30
Refills 1   Refs/Qty Left 1 /30       Plan(s)      Pay  $   -3.97*Last  DEFAULT
   ┌─ Directions (English) ─┐         CIGNA      -6.66P $   -4.17*Price DEFAULT
   │ TAKE ONE CAPSULE EVERY DAY       MEDICAID    2.49P $        Disc
   │                                             $            Tax
   │                                  Orig Rx 05/18/15 $   -4.17 Total
   │                                  Rx Date 05/18/15 $    1.35 Cost (1.35)
   │                                  Written 05/18/15 $   -5.52 Margin
   └─Day's Supply 30 ─────┘           Expired 05/17/16 $    0.00 Patient Pays
                                                     RX PICKED UP
                       •              Rx Memo
                                      Status Refillable        Delivery Will-Call
ORIG 2 PHONE    DAW 0                 Labels 1   Label 60231       Prt 5      Pri 3

           F2ClrF3SelectF4 Text F5SpanshF6NoXlat                      F9 Help 10Insert
```

```
Drug OMEPRAZOLE DR 20 MG CAPSULE     Onhand 0         Last Qty 30      On 06/16/15
NDC 55111-0158-10 GENERIC PS 1000.00  Unit Dose? N
P  A                                  USE SAFETY CAP

**Plan*****Submitted*Adjudicated**PlanPay****Copay*Last Copay*******Drug U&C**
* CIGNA     $ 154.50 $    -4.17 $   -6.66 $    2.49                  $ 154.50 *
* MEDICAID  $   2.49 $     2.49 $    2.49 $     .00 DAW              Drug Cost *
*                                                                   $   1.35 *
*           IngrdCost    DispFee   Incentive   SalesTax    Price       Margin *
* Submitted $ 149.45 $    5.05 $     .00 $     .00 Difference       $ 153.15 *
* CIGNA     $   1.09 $    1.40 $     .00 $     .00 $ 158.67         $  -5.52 *
* CIGNA INGREDIENT COST PAID AT MAC PRICE
Rx Fill Date: 05/18/2015  Day Supply: 30
```

DB-000003

96.      As reflected in DB-000003, above, the *primary* insurer – Cigna – did not pay anything for the Omeprezole delivered to its insured. Instead, the pharmacy – who previously had paid $1.35 for the Omeprezole so as to have it available for patients, and who incurred the costs necessary to fill the prescription – *paid Cigna $6.66*. Simultaneously, Medicaid – the *secondary* payer – paid $2.49 to the pharmacy. Thus understood, the pharmacy's total out of pocket cost for this transaction was $8.01 ($6.66 + $1.35 = $7.91), and the pharmacies total reimbursement was $2.49.  Resulting in a loss of $5.52 ($8.01 – $2.59 = $5.32).

26

```
                                                          SN '    ..
      Drug OMEPRAZOLE DR 20 MG CAPSULE   Onhand 0      Last Qty 60    On 07/29/16
NDC 55111-0158-10 GENERIC PS 1000.00   Unit Dose? N
P  A                                   USE SAFETY CAP
    Quantity 60      Dispensed 60
Refills 1   Refs/Qty Left 1 /60       Plan(s)     Pay $    4.18*Last  DEFAULT
  ───── Directions (English) ─────    CIGNA      -11.67P $  -7.88*Price DEFAULT
  TAKE ONE CAPSULE TWO TIMES A        MEDICAID    3.79P $     Disc
  DAY                                            $     Tax
                                      Orig Rx 01/22/16 $  -7.88 Total
                                      Rx Date 01/22/16 $   2.71 Cost (2.05)
                                      Written 01/22/16 $ -10.59 Margin
  ───Day's Supply 30 ─────           Expired 01/21/17 $   0.00 Patient Pays
                                               RX PICKED UP
          ¢                           Rx Memo Renewed From Rx ████ Renewed>>
                                      Status Refillable    Delivery Will-Call
ORIG 2 PHONE     DAW 0                Labels 1   Label 60231      Prt 5      Pri 3
                                               Patient Plans Have Changed
          F2Clear              F4Label F5RxHistF6RfHistF7DetailF8OptionF9 Help 10 Edit


      Drug OMEPRAZOLE DR 20 MG CAPSULE   Onhand 0      Last Qty 60    On 07/29/16
NDC 55111-0158-10 GENERIC PS 1000.00   Unit Dose? N
P  A                                   USE SAFETY CAP
**Plan****Submitted*Adjudicated**PlanPay****Copay*Last Copay********Drug U&C**
* CIGNA     $  254.50 $   -7.88 $ -11.67 $   3.79                 $  254.50 *
* MEDICAID  $    3.79 $    3.79 $   3.79 $    .00 DAW             Drug Cost *
*                                                                 $    2.71 *
*           IngrdCost   DispFee  Incentive  SalesTax        Price        Margin *
* Submitted $  249.09 $    5.41 $     .00 $    .00  Difference  $  251.79 *
* CIGNA     $    2.39 $    1.40 $     .00 $    .00  $  262.38    $  -10.59 *
* CIGNA INGREDIENT COST PAID AT MAC PRICE                                  *
Rx Fill Date: 01/22/2016   Day Supply: 30
```

DB-000004

97.    As reflected in DB-000004, above, the *primary* insurer – Cigna – did not pay anything for the Omeprezole delivered to its insured. Instead, the pharmacy – who previously had paid $2.71 for the Omeprezole so as to have it available for patients, and who incurred the costs necessary to fill the prescription – *paid Cigna $11.67*. Simultaneously, Medicaid – the *secondary* payer – paid $3.79 to the pharmacy. Thus understood, the pharmacy's total out of pocket cost for this transaction was $14.38 ($11.67 + $2.71 = $14.38), and the pharmacies total reimbursement was $3.79. Resulting in a loss of $10.59 ($14.38 – $3.79 = $10.59).



DB-000005

98.     As reflected in DB-000005, above, the *primary* insurer – Cigna – did not pay anything for the Amoxicillin delivered to its insured. Instead, the pharmacy – who previously had paid $5.72 for the Amoxicillin so as to have it available for patients, and who incurred the costs necessary to fill the prescription – *paid Cigna $5.72*. Simultaneously, Medicaid – the *secondary* payer – paid $4.28 to the pharmacy. Thus understood, the pharmacy's total out of pocket cost for this transaction was $19.11 ($5.72 + $13.39 = $19.11), and the pharmacies total reimbursement was $4.28.  Resulting in a loss of $14.83 ($19.11 – $4.28 = $14.83).

99.     Further evidence that Defendants' knew that their kickback scheme is illegal can be found in their conduct and statements in connection with Relator Butterfield's attempts to expose Defendants' wrongdoing.

100.     As detailed more fully below, Defendants expressly admitted participating in this scheme, i.e., Defendants admitted that although a limited number of transactions causes

pharmacies to sustain losses, Defendants steer additional business to the pharmacies that contains "padded" profit to make up for the losses and more.

101.   Specifically, in 2014 and 2015 Relator Butterfield attempted to bring Defendants' scheme to the attention of her local government officials. Immediately thereafter, Relator Butterfield was explicitly told by Defendants (UHC, Optum and Cigna) and Catamaran (later acquired by UHC/Optum) that she should refrain from doing so or expect to be cut off from their provider networks.

102.   On August 14, 2015, Cigna representatives wrote: "It needs to be pressed to Catamaran that this individual is stirring up strife with key decision makers within our government clients and may be breached her contract agreements in doing so." DB-000730.

103.   Representatives of Catamaran (now UHC/Optum) wrote to Relator Butterfield on August 17, 2015, stating: "If you continue to discuss pricing with the client of CatamaranRx (Cigna) CatamaranRX will terminate their agreement with your pharmacy for their networks." DB-000717. After attempting to expose Defendants' wrongdoing to government officials, Relator Butterfield was termed the "rogue pharmacist." DB-000736.

104.   In response to Relator Butterfield's attempts to expose the scheme, a Cigna representative wrote on August 5, 2015, that:

> I feel that Cigna needs to meet this pharmacist and educate her on *our entire program offering*. Clearly, she's concerned about "our reimbursement rate on 10% of the medications she dispenses which are below 'her cost' of the drug" and we need to help her understand the profit she's making on the other 90% of the medications she dispenses. Any information you can provide will be helpful in our efforts to educate this one individual.

DB-000732 (emphasis added).   On August 20, 2015, another Cigna representative wrote:

> Worthy to note is that while revenue is made on drugs that are under these factors, it does not encompass all drugs.  That said, this pharmacist is speaking in 'half-truths' (in my opinion). She is not declaring the *'padded' profit she is making* on the 90% of the drugs not under these factors (Rx claims where we pay more than

her actual cost). She's only complaining about the 10% of dispensed medications where she is losing money.

DB-000737 (emphasis added).

105.    Defendants thus admitted to a "program" in which pharmacies: (1) are "losing money" on approximately 10% of their transactions; but, (2) recoup such losses through "padded" profits on the remaining 90% of their transactions.

106.    Defendants thereby concede that they are forcing pharmacies to kickback money on certain transactions (which result in charges to the government and from which Defendants make outsized profits) but that pharmacies make up for such imposed losses with "padded" profits on other transactions that Defendants provide them as part of network participation.

## FALSE CLAIMS TO GOVERNMENT HEALTH PROGRAMS

107.    Defendants have caused false claims to be submitted to the government. As detailed above, Defendants have caused participating pharmacies to pay Defendants a kickback (e.g., DB-000001 through DB-000005) in connection with transactions where the government is an end payor. Defendants leverage their market power over pharmacies to impose these kickbacks. Each claim which resulted in the government paying money to Defendants was tainted by the kickback arrangement orchestrated by Defendants. Since kickback-tainted claims are violations of the FCA as a matter of law, each such submitted claim was false and a violation of the FCA and the State FCAs.

## DAMAGE TO GOVERNMENT HEALTH PROGRAMS

108.    Defendants have caused the government to overpay for prescription drugs by causing the government to pay when no payment was warranted or by causing the government to pay in amounts above what the government should have paid. As detailed above, Defendants caused participating pharmacies to pay the full cost of the medication (e.g., DB-000001 through

30

DB-000005), thus leaving no end payer obligation and negating any requirement by any other party or insurer to pay any further amounts.  Despite the fact that no claim for additional insurance payment exists or should be filed, Defendants nevertheless fraudulently billed excessive payments from the government in connection with such pharmaceutical sales.

109.   For example, in the June 16, 2015, transaction cited above (DB-000001), Defendants caused the government to pay $2.59, notwithstanding the fact that: (1) the actual cost of the drug was $1.35; and, (2) the pharmacy had already paid $6.56 for the drug.



DB-000001

Given that the cost of the drug was only $1.35 *and* the pharmacy had already paid for the drug in full, there was no obligation for the government to pay $2.59. As a result of this scheme, the government has been damaged by overpaying for kickback-tainted pharmaceuticals.

## COUNT I

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)[1986] and
### 31 U.S.C. §3729(a)(1)(A)[2009]

110.   Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

111.    Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

112.    By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729(a)(2) [1986] and
### 31 U.S.C. §3729(a)(1)(B)[2009]

113.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

114.    Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2) [1986].  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid.

115.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

116.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(3)[1986] and
### 31 U.S.C. §3729(a)(1)(C)[2009]

117.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

118.     Through these acts, and further as set forth in Counts I and II, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the United States has suffered actual damages.

## COUNT IV

### THE CALIFORNIA FALSE CLAIMS ACT (the "Act"),
### CALIFORNIA GOVERNMENT CODE §§ 12651, et seq.

119.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein, including but not limited to evidence that shows Defendants violated California Business and Professions Code §650, California Welfare and Institutions Code §14107.2, and the California Code of Regulations Title 22 §51501(a).

120.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 12651(a)(1) of the Act.  Such claims caused actual damages to the State.

121.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 12651(a)(2) of the Act.  Such claims caused actual damages to the State.

122.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT V

**CONNECTICUT FALSE CLAIMS ACT
FOR PUBLIC ASSISTANCE PROGRAMS (the "Act")
CONN. GEN. STAT. § 17b-301 et seq.**

123.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

124.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act.  Such claims caused actual damages to the State.

125.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act.  Such claims caused actual damages to the State.

126.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VI

**THE DELAWARE FALSE CLAIMS AND REPORTING ACT (the "Act"),
DEL. CODE ANN. TIT. 6, § 1201 et seq.**

127.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

128.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1201(a)(1) of the Act.  Such claims caused actual damages to the State.

129.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1201(a)(2) of the Act.  Such claims caused actual damages to the State.

130.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VII

### THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT (the "Act"),
### D.C. CODE ANN. §§ 2-308.14 et seq.

131.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

132.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the District of Columbia in violation of Section 308.14(a)(1) of the Act.  Such claims caused actual damages to the State.

133.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 308.14(a)(2) of the Act.  Such claims caused actual damages to the State.

134.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VIII

### THE FLORIDA FALSE CLAIMS ACT (the "Act"),
### FLA. STAT. §§ 68.082(2) et seq.

135.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

136.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

137.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

138.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

**COUNT IX**

**GEORGIA FALSE MEDICAID CLAIMS ACT (the "Act")**
**GA. CODE ANN. §49-4-168.1 et seq.**

139.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

140.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act.  Such claims caused actual damages to the State.

141.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act.  Such claims caused actual damages to the State.

142.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT X

### HAWAII FALSE CLAIMS ACT (the "Act")
### HAW. REV. STAT. §661-21 et seq.

143.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

144.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 661-21(a)(1) of the Act.  Such claims caused actual damages to the State.

145.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 661-21(a)(2) of the Act.  Such claims caused actual damages to the State.

146.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XI

### THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT (the "Act"),
### 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.

147.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

148.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1) of the Act.  Such claims caused actual damages to the State.

149.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(2) of the Act.  Such claims caused actual damages to the State.

150.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XII

### THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT (the "Act"), INDIANA CODE 5-11-5.5-2 et seq.

151.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

152.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(2), of the Act.  Such claims caused actual damages to the State.

153.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5-11-5.5-2(b)(8), of the Act.  Such claims caused actual damages to the State.

154.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XIII

### LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW (the "Act") LA. REV. STAT. § 46:438.3 et seq.

155.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

156.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A) of the Act.  Such claims caused actual damages to the State.

38

157.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(B) of the Act.  Such claims caused actual damages to the State.

158.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XIV

### THE MARYLAND FALSE HEALTH CLAIMS ACT (THE "ACT")
### MD.    CODE ANN., HEALTH-GEN §§2-602 et seq.

159.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

160.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2-602(A)(1), of the Act.  Such claims caused actual damages to the State.

161.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2-602(A)(2), of the Act.  Such claims caused actual damages to the State.

162.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XV

### THE MASSACHUSETTS FALSE CLAIMS ACT (the "Act"),
### MASS. ANN.  LAWS. CH. 12, §§ 5B et seq.

163.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

164.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act.  Such claims caused actual damages to the State.

165.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  5B(2), of the Act.  Such claims caused actual damages to the State.

166.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XVI

### MICHIGAN MEDICAID FALSE CLAIMS ACT (the "Act"), MCLS §§ 400.607 et seq.

167.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

168.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act.  Such claims caused actual damages to the State.

169.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act.  Such claims caused actual damages to the State.

170.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XVII

**MINNESOTA FALSE CLAIMS ACT (the "Act"),**
**MINN. STAT. §15C.02 et seq.**

171.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

172.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 15C.02(a)(1), of the Act.  Such claims caused actual damages to the State.

173.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 15C.01(a)(2), of the Act.  Such claims caused actual damages to the State.

174.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

### COUNT XVIII

**MONTANA FALSE CLAIMS ACT**
**MONT. CODE ANN. 17-8-403(1) et seq.**

175.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

176.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17-8-403(1)(a), of the Act.  Such claims caused actual damages to the State.

177.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  17-8-403(1)(b) of the Act.  Such claims caused actual damages to the State.

178.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XIX

### THE NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT (the "Act"), NEV. REV. STAT. §§ 357.040 et seq.

179.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

180.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 357.040(1)(a), of the Act.  Such claims caused actual damages to the State.

181.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 357.040(1)(b), of the Act.  Such claims caused actual damages to the State.

182.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XX

### NEW HAMPSHIRE FALSE CLAIMS ACT (the "Act") N.H. REV. STAT. ANN. §167:61-b et seq.

183.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

184.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 167:61-b(I)(a), of the Act.  Such claims caused actual damages to the State.

185.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 167:61-b(I)(b), of the Act.  Such claims caused actual damages to the State.

186.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXI

### NEW JERSEY FALSE CLAIMS ACT (the "Act")
### N.J. STAT. §2A:32C-3 et seq.

187.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

188.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2A:32C-3(a), of the Act.  Such claims caused actual damages to the State.

189.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false  records or statements material to a false or fraudulent claim to the State, in violation of Section 2A:32C-3(b), of the Act.  Such claims caused actual damages to the State.

190.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXII

### THE NEW MEXICO MEDICAID FALSE CLAIMS ACTN.M.
### STAT. ANN. § 27-14-4A et seq.

191.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

192.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 27-14-A(1), of the Act.  Such claims caused actual damages to the State.

193.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  27-14-4A(2), of the Act.  Such claims caused actual damages to the State.

194.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

### COUNT XXIII

### THE NEW YORK FALSE CLAIMS ACT (the "Act"),
### NY CLS ST. FIN. § 189 et seq.

195.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

196.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 189(1)(a), of the Act.  Such claims caused actual damages to the State.

197.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 189(1)(b), of the Act.  Such claims caused actual damages to the State.

198.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIV

### NORTH CAROLINA FALSE CLAIMS ACT (the "Act")
### N.C. GEN. STAT. §1-607(A) et seq.

199.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

200.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1-607(A)(1), of the Act.  Such claims caused actual damages to the State.

201.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1-607(A)(2), of the Act.  Such claims caused actual damages to the State.

202.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXV

### OKLAHOMA MEDICAID FALSE CLAIMS ACT (the "Act")
### OKLA. STAT. TIT. 63, §5053.1B et seq.

203.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

204.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5053.1B(1), of the Act.  Such claims caused actual damages to the State.

45

205. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5053.1B(2), of the Act. Such claims caused actual damages to the State.

206. Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act. By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXVI

### RHODE ISLAND FALSE CLAIMS ACT (the "Act")
### R.I. GEN. LAWS §9-1.1-3 et seq.

207. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

208. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 9-1.1-3(a)(1), of the Act. Such claims caused actual damages to the State.

209. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 9-1.1-3(a)(2), of the Act. Such claims caused actual damages to the State.

210. Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act. By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXVII

### THE TENNESSEE MEDICAID FALSE CLAIMS ACT (the "Act"),
### TENN. CODE ANN. §§ 71-5-182(a) et seq.

211.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

212.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 71-5-182(a)(1)(A), of the Act.  Such claims caused actual damages to the State.

213.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 71-5-182(a)(1)(B), of the Act.  Such claims caused actual damages to the State.

214.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXVIII

### TEXAS MEDICAID FRAUD PREVENTION ACT
### TEX. HUM. RES. CODE ANN. §36.002 ET SEQ.

215.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

216.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 36.002(1), of the Act.  Such claims caused actual damages to the State.

217.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 36.002(4), of the Act.  Such claims caused actual damages to the State.

47

218.    Through these acts, Defendant knowingly made a claim for a product that has been adulterated, debased, mislabeled or that is otherwise inappropriate in violation of Section 36.002(7).  Such claims caused actual damages to the State.

219.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIX

### THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT (the "Act"), VA. CODE §§ 8.01-216.3A ET SEQ.

220.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

221.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 8.01-216.3A(1), of the Act.  Such claims caused actual damages to the State.

222.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 8.01-216.3A(2), of the Act.  Such claims caused actual damages to the State.

223.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXX

### WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT (the "Act") WIS. STAT. §20.931(2) ET SEQ.[7]

---

[7] The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931, *et seq.* was repealed effective July 15, 2015.  Relator seeks only false claims resulting from Defendants' conduct alleged herein to those false claims prior to this date.

224.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

225.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 20.931(2)(a), of the Act.  Such claims caused actual damages to the State.

226.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 20.931(2)(b), of the Act.  Such claims caused actual damages to the State.

227.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXXI

### COLORADO MEDICAID FALSE CLAIMS ACT (the "Act")
### Colorado Stat. §§25.5-4-304 - 25.5-4-310

228.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

229.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section   §§25.5-4-304 - 25.5-4-310), of the Act.  Such claims caused actual damages to the State.

230.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section §§25.5-4-304 - 25.5-4-310of the Act.  Such claims caused actual damages to the State.

231.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXXII

## ALASKA MEDICAL ASSISTANCE FALSE CLAIMS REPORTING ACT (the "Act")
### Ak Stat § 09.58.010 et seq. (2016)

232.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

233.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section  § 09.58.010 of the Act.  Such claims caused actual damages to the State.

234.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section § 09.58.010  of the Act.  Such claims caused actual damages to the State.

235.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired with nursing homes to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

### DEMAND FOR JURY TRIAL

236.    A jury trial is demanded in this case.

## REQUESTS FOR RELIEF

WHEREFORE, Relators, on behalf of the United States and the Plaintiff States, demand that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal

Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the state statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCA's.

Further, Relator requests that they receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relators request that this award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

Dated: December 3rd, 2018

Respectfully submitted,

Elaine Stromgren
Florida Bar No.: 0417610
estromgren@jameshoyer.com
Jesse L. Hoyer
Florida Bar No. 0076934
jlhoyer@jameshoyer.com
**JAMES HOYER, P.A.**
2801 West Busch Boulevard, Suite 200
Tampa, Florida 33618
Telephone: 813-375-3700
Fax: 813-375-3717


Robert A. Izard
Craig A. Raabe
Christopher M. Barrett
**IZARD, KINDALL & RAABE, LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292

rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold
Mathew Jasinski
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, Floor 17
Hartford, CT 06103
Telephone: (860) 882-1676
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
10 Bond Street, Suite 212
Great Neck, New York 11021
Telephone: (516) 699-8890
ronen@sarrafgentile.com
joseph@sarrafgentile.com

(to be admitted *pro hac vice*)